UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BYRON K. GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cv-00168-SRC |
| | ) | |
| CLEMENT AUTO GROUP, LLC et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>Memorandum and Order</u>**

Byron Green claims that Clement, his former employer, violated federal employment

laws when it terminated him during his intermittent medical leave.  But Clement tells a different

story.  In its version, Clement fired Green not because of his medical leave, but because he

repeatedly logged time for periods he was not at work.  Believing Green's "time theft" to be

extensive, Clement countersued him.  Both parties move for summary judgment, and the Court

sorts out these competing motions below.

## I.   Background

### A.   Factual background

The Court finds the following facts undisputed for purposes of the parties' competing

motions for summary judgment, unless otherwise noted.  Penuel Raj Clement is the owner of

Clement Auto Group, a company that operates several automobile dealerships in Missouri,

including Clement Hyundai.  Doc. 1 at ¶¶ 9–10; doc. 44 at ¶¶ 1–2; doc. 49 at 5 (The Court cites

to page numbers as assigned by CM/ECF.).  Byron Green began working for Clement Hyundai

as a service advisor in February 2022.  Doc. 46 at ¶ 1; doc. 48 at ¶ 1; doc. 53 at ¶ 1.

As a service advisor, Green's job duties included communicating and interacting with customers regarding automobile repairs, speaking with technicians, reviewing repair orders, and handling internal service department coordination.  Doc. 48 at ¶ 3; doc. 53 at ¶ 3; doc. 54 at ¶ 15; doc. 57 at ¶ 15; *see also* doc. 49-1.  Green's role "required on-site duties at the dealership."  Doc. 46 at ¶ 2; *see also* doc. 48 at ¶ 2; doc. 53 at ¶ 2.  And he reported to his supervisor, Christopher Bone, who was responsible for reviewing and approving his time.  Doc. 46 at ¶ 17; doc. 48 at ¶ 21; doc. 53 at ¶ 21.  Bone could also modify employee time entries in Paycom (an online payroll software) and did so for Green on occasion.  Doc. 54 at ¶ 20; doc. 57 at ¶ 20.

Green received, signed, and acknowledged the employee handbook Clement gave him.  Doc. 46 at ¶ 3; doc. 48 at ¶ 4; doc. 53 at ¶ 4.  The handbook required employees to clock in and out using Paycom.  Doc. 48 at ¶ 5; doc. 53 at ¶ 5; *see also* doc. 46 at ¶¶ 4–6.  It also "contain[ed] timekeeping policies regarding clock-in and clock-out procedures, including guidance concerning scheduled shift times."  Doc. 46 at ¶ 4.  For example, the handbook instructed employees to clock in or out within five minutes of their scheduled shifts.  Doc. 48 at ¶ 6; doc. 53 at ¶ 6.  And it "provide[d] that violations of timekeeping policies may result in disciplinary action, including termination."  Doc. 46 at ¶ 5; *see also* doc. 48 at ¶ 8; doc. 53 at ¶ 8.

Green recorded his time through the Paycom app on his phone, doc. 46 at ¶ 6, and he was able to clock in and out remotely—i.e., "while off of dealership property," doc. 46 at ¶ 7; *see also* doc. 48 at ¶ 22; doc. 53 at ¶ 22.  Green admits that he clocked out remotely "[o]n occasion."  Doc. 46 at ¶ 8.  The employee handbook notes that clocking in and out at a location other than the dealership violated company policy.  Doc. 48 at ¶ 23; doc. 53 at ¶ 23.

On December 4, 2023, Green received a rectal cancer diagnosis that required him to undergo radiation treatments.  Doc. 46 at ¶¶ 9, 13–14; doc. 49-7 at 4.  After receiving this

2

diagnosis, Green requested intermittent leave from Clement under the Family and Medical Leave Act of 1993 (FMLA).  Doc. 46 at ¶¶ 10–11; doc. 48 at ¶ 10; doc. 53 at ¶ 10.  The parties agree that FMLA leave is generally unpaid.  Doc. 48 at ¶ 13; doc. 53 at ¶ 13.  Green's physician certified this leave "beginning December 4, 2023 through approximately April 1, 2024."  Doc. 46 at ¶ 10; *see also* doc. 48 at ¶ 11; doc. 53 at ¶ 11.  Green's FMLA paperwork estimated that Green would need to be intermittently absent from work "five times per week," with each occurrence lasting "approximately 8 hours."  Doc. 48 at ¶ 12; *see* doc. 53 at ¶ 12.  Clement became aware of Green's cancer diagnosis upon receiving his FMLA paperwork in December 2023.  Doc. 49 at 4–5; doc. 49-5 at 1, 6.  In attempting to state a claim for interference with his FMLA rights, Green alleges differently in his Complaint.  *See* doc. 1 at ¶¶ 27–31.  But at the summary-judgment stage, Green fails to proffer any admissible evidence to support his claim.[1] The Court accordingly finds as undisputed fact that Clement learned of Green's diagnosis in December 2023 and that Green has abandoned this claim.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.").

Clement noticed something curious about Green's time entries.  Green admits attending medical appointments in December 2023, doc. 46 at ¶ 14, and undergoing radiation treatments in

---

[1] Although Green purported to verify his Complaint, *see* doc. 1 at 13–14, the Court does not treat the Complaint as verified, either as an affidavit or a declaration, because it does not meet the requirements for either.  Green did not attest to the facts before a notary or other person authorized to administer an oath, nor did he attest to the facts under penalty of perjury.  *See id.*; 28 U.S.C. § 1746; *Roberson v. Hayti Police Dep't*, 241 F.3d 992, 994–95 (8th Cir. 2001) ("A plaintiff's verified complaint is the equivalent of an affidavit for purposes of summary judgment, and a complaint signed and dated as true under penalty of perjury satisfies the requirements of a verified complaint." (citation modified)); *Elder-Keep v. Aksamit*, 460 F.3d 979, 984 (8th Cir. 2006) (noting that an affidavit is "a statement reduced to writing and the truth of which is sworn to before someone who is authorized to administer an oath" (citation omitted)); *see also Zavala-Alvarez v. Darbar Mgmt., Inc.*, 617 F. Supp. 3d 870, 878 n.1 (N.D. Ill. 2022) ("A document doesn't count as an affidavit or declaration simply because of its title.  Here, M. Salim Moten's statement was not sworn before an officer authorized to administer an oath, so it is not an affidavit." (citation omitted)); 10B *Wright & Miller's Federal Practice & Procedure* § 2738 (4th ed. 2026).

3

January and February 2024, *id.* at ¶ 13.  Yet despite Clement's granting him intermittent FMLA leave, *id.* at ¶ 11, "[n]o FMLA leave entries appear in [Green's] Paycom time records between December 5, 2023 and March 15, 2024," *id.* at ¶ 12; *see also* doc. 48 at ¶ 18; doc. 53 at ¶ 18. Instead, Green's time records show that he logged time during this period.  Doc. 46 at ¶ 15; *see also* doc. 48 at ¶ 19; doc. 53 at ¶ 19.  On certain dates, Green's Paycom records show clock-in times before 8:00 a.m., and his medical records reflect appointments on those same dates at approximately 8:00 a.m.  Doc. 46 at ¶ 16.

On March 15, 2024, Clement terminated Green's employment.  *Id.* at ¶ 18; doc. 48 at ¶ 24; doc. 53 at ¶ 24.  Clement designated Green's termination as one for "gross misconduct." Doc. 46 at ¶ 19; doc. 48 at ¶ 26; doc. 53 at ¶ 26.  Based on this designation, Clement notified Green that he was ineligible for coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).  Doc. 46 at ¶ 20; doc. 48 at ¶ 26; doc. 53 at ¶ 26.

## B.       Procedural background

Green sued Clement in February 2025.  *See* doc. 1.  He brings claims for (1) FMLA interference, *id.* at ¶¶ 50–59; (2) FMLA retaliation, *id.* at ¶¶ 60–63; and (3) failure to provide COBRA coverage, *id.* at ¶¶ 65–71.  For relief, Green seeks monetary damages, attorneys' fees and litigation costs, and pre- and post-judgment interest.  *Id.* at 12.  Defendants filed their answers in April 2025.  *See* docs. 20–21.

The Court held a Rule 16 Conference in May 2025, doc. 29, and entered a case-management order, doc. 30.  After the parties completed alternative dispute resolution, *see* docs. 32–36, Clement moved for leave to file a counterclaim against Green, doc. 38.  The parties briefed this issue, docs. 40, 42, and the Court permitted Clement to file a counterclaim, doc. 43. In the counterclaim, Clement sues for (1) breach of contract, doc. 44 at ¶¶ 26–30; (2) unjust

enrichment, *id.* at ¶¶ 31–38, and (3) common-law fraud, *id.* at ¶¶ 39–52, all based on Green's alleged time theft.  Green filed his answer to the counterclaim in January 2026.  Doc. 45.

Clement moved for summary judgment on all of Green's claims in February 2026.  Docs. 47–49.  On the same day, Green moved for partial summary judgment on Clement's fraud claim. Docs. 50–51.  The parties have fully briefed these motions, docs. 52–59, so they are ripe for the Court's review.

## II.     Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is genuine "if the evidence is such that it could cause a reasonable jury to return a verdict for either party."  *Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1157 (8th Cir. 2016) (citation omitted). And a fact is material "if its resolution affects the outcome of the case."  *Id.* (citation omitted).

In ruling on a motion for summary judgment, the Court is required "to view the evidence in the light most favorable to the non-moving party" and must "give that party the benefit of all reasonable inferences to be drawn from the underlying facts."  *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  Importantly, "the mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the

dispute must be outcome determinative under prevailing law." *Corkrean v. Drake Univ.*, 55 F.4th 623, 630 (8th Cir. 2022) (citation modified).  Self-serving, conclusory statements without support are insufficient to defeat summary judgment.  *See Armour & Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    Discussion

### A.    Clement's motion for summary judgment

Clement moves for summary judgment on all three of Green's claims.  *See* doc. 47 at 1. The Court addresses each claim in turn.

### 1.    FMLA claims

The FMLA entitles an employee to "up to twelve workweeks of leave during any twelve-month period for various medical-related circumstances."  *Whittington v. Tyson Foods, Inc.*, 21 F.4th 997, 1000 (8th Cir. 2021) (citing 29 U.S.C. § 2612(a)(1)).  One such circumstance allows the employee to seek leave based on "a serious health condition" that makes him "unable to perform the functions of [his] position."  *Id.* at 1001 (quoting 29 U.S.C. § 2612(a)(1)(D)).  The employee may take FMLA leave on an intermittent basis if he reaches an agreement with his employer.  *See Ballato v. Comcast Corp.*, 676 F.3d 768, 772 (8th Cir. 2012) (citing 29 U.S.C. § 2612(b)(1)).

The Eighth Circuit has varied its description of the types of FMLA claims an employee may bring.  In some instances, the Eighth Circuit has stated that an employee may bring two types of claims:  (1) interference claims, "where the employee alleges that the employer denied

or interfered with [his] substantive rights under the FMLA," and (2) retaliation claims, "where the employee alleges that the employer discriminated against [him] for exercising [his] FMLA rights." *Brandt v. City of Cedar Falls*, 37 F.4th 470, 478 (8th Cir. 2022) (citation omitted). In other instances, however, it has recognized *three* types of FMLA claims. *See, e.g.*, *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005–06 (8th Cir. 2012). In these situations, the description of "interference" claims remains the same (although the Eighth Circuit refers to them as "entitlement" claims). *See id.* But the Eighth Circuit then distinguishes between "retaliation" claims—where an employer takes adverse action against an employee for opposing any practice the FMLA makes unlawful—and "discrimination" claims, where an employer takes adverse action against an employee for exercising his FMLA rights. *See id.*

Green styles his FMLA claims as "interference" and "retaliation" claims, seeming to adhere to the descriptions the Eighth Circuit uses in *Brandt*. *See* doc. 1 at ¶¶ 50–63. The Court recognizes that these same claims might be called "entitlement" and "discrimination" claims under the Eighth Circuit's framework in *Pulczinski*. Nevertheless, because the same standards apply regardless of the particular labels the Court chooses, *see Brown v. Diversified Distrib. Sys., LLC*, 801 F.3d 901, 907–10 (8th Cir. 2015), the Court refers to Green's claims the way Green does: as "interference" and "retaliation" claims.

### a.  Interference claims

Under 29 U.S.C. § 2615(a)(1), an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." An employer violates this section if it "refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act." *Brown*, 801 F.3d at 907 (citation omitted). For example, an employer may not "discourag[e] an employee from using [FMLA] leave." 29 C.F.R.

§ 825.220(b).  Nor may the employer attempt to impede the employee's eligibility by transferring the employee to a different worksite, changing the essential functions of the employee's job, or reducing the employee's hours.  *Id.*  The employer also "cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions[,] or disciplinary actions."  *Ballato*, 676 F.3d at 772 (quoting 29 C.F.R. § 825.220(c)).

To succeed on an FMLA interference claim, a plaintiff must prove that (1) he was an eligible employee; (2) the defendant qualified as an employer under the FMLA; (3) he was entitled to FMLA leave; (4) he gave defendant notice of his intent to take FMLA leave; and (5) defendant denied him FMLA benefits to which he was entitled.  *Brandt*, 37 F.4th at 478.  Put differently, the plaintiff bears the initial burden of proof to "show only that he or she was entitled to the benefit denied."  *Ballato*, 676 F.3d at 772.  "Even if successful on this front, a claim for interference will fail unless the employee also shows that the employer's interference prejudiced [him] as the result of a real, remediable impairment of [his] rights under the FMLA."  *Massey-Diez*, 826 F.3d at 1158.  And a plaintiff seeking to avoid summary judgment must also show "a reasonable likelihood that a rational trier of fact would award damages or find an entitlement to injunctive relief."  *Brandt*, 37 F.4th at 478 (citation modified).  Importantly, "[t]he employer's intent is immaterial to an FMLA interference claim."  *Massey-Diez*, 826 F.3d at 1158.

Here, the parties do not dispute that Clement is an employer for FMLA purposes or that Green was eligible for and entitled to FMLA leave.  *See* doc. 1 at ¶¶ 51–56; doc. 48-6 at 6–7.  Nor do they dispute that Green gave Clement notice of his intent to take intermittent FMLA leave.  *See* doc. 48 at ¶ 10; doc. 53 at ¶ 10.  The sole issue, then, is whether Clement denied Green FMLA benefits to which he was entitled.

### i.    Terminating Green's employment

Green alleges that Clement interfered with the exercise of his FMLA rights by "terminating [his] employment" and "fabricating a false pretextual reason" for doing so.  Doc. 1 at ¶ 57(d)–(e).  "[E]very discharge of an employee while [he] is taking FMLA leave interferes with an employee's FMLA rights." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050–51 (8th Cir. 2006) (citation omitted).  But "the mere fact of discharge *during* FMLA leave by no means demands an employer be held strictly liable for violating the FMLA's provision of interfering with an employee's FMLA rights." *Id.* at 1051 (citation omitted).  So, if the plaintiff makes a showing of interference, "the burden shifts to the employer to prove there was a reason unrelated to the employee's exercise of FMLA rights for terminating the employee." *Ballato*, 676 F.3d at 772.  And "[i]f the employer can prove that it would have terminated the employee had the employee not exercised FMLA rights, the employer will not be liable." *Id.* (citation omitted); *see also Stallings*, 447 F.3d at 1051 ("[W]here an employer's reason for dismissal is insufficiently related to FMLA leave, the reason will not support the employee's recovery.").

Here, the parties agree that Clement terminated Green's employment during his period of intermittent FMLA leave.  *See* doc. 46 at ¶ 10 (noting that "[Green's] physician certified FMLA leave beginning December 4, 2023 through approximately April 1, 2024); *id.* at ¶ 18 (noting that Clement terminated Green's employment on March 15, 2024).  Green has therefore shown interference, so the burden shifts to Clement to prove that Green's termination was unrelated to the exercise of his FMLA rights.  *Ballato*, 676 F.3d at 772.

Clement argues that it fired Green because he engaged in "time theft" by "letting his time clock run while he was not working and offsite for FMLA-related purposes."  Doc. 49 at 6.

9

It asserts that Green's supervisor (Christopher Bone) and another employee (Jay Brown) began to "notice[] that [Green] was not physically present on site when the payroll system reflected that he was clocked in for work." *Id.* at 10–11; *see also* doc. 49-8 at ¶¶ 29–31 (Bone affidavit); doc. 49-13 at ¶¶ 14–16 (Brown affidavit). And after "monitor[ing] the situation more closely," Bone and Brown "confirmed that [Green] was repeatedly not present at his place of employment on the days that he claimed to be working." Doc. 49 at 11; *see also* doc. 49-8 at ¶¶ 29–31; doc. 49-13 at ¶¶ 14–16.

Clement provides specific examples of Green's timecard discrepancies. For example, on December 8, 2023, "Green's timecard reflects that he worked from 7:39 a.m. until 5:43 p.m." Doc. 49 at 9; *see* doc. 49-6 at 1. But his medical records show that he received an MRI between 3:16 p.m. and 3:46 p.m. that day, as well as a CT scan at 4:12 p.m. Doc. 49 at 9; doc. 49-7 at 9–10. Green's FMLA paperwork also shows that he had medical appointments on December 20, 2023; December 22, 2023; and January 16, 2024. Doc. 49 at 9; doc. 49-5 at 4; doc. 49-7 at 1–8. But "on each of those days, [Green's] timesheets report he worked full days—even overtime." Doc. 49 at 9; *see* doc. 49-6 at 2, 4. Green also had several 8:00 a.m. radiation treatments in January and February 2024. Doc. 49 at 9; *see* doc. 49-7 at 1. But his time entries on several of those dates—particularly January 17 and February 5, 14, and 26—show clock-in times well before 8:00 a.m. *See* doc. 49 at 9–10; doc. 49-6 at 4–7. And because Green's appointments were "a thirty-minute drive from the dealership," Clement argues, "it is illogical that [Green] began working at the dealership" at his recorded clock-in times "when he had an 8 am [sic] radiation treatment 30 minutes away." Doc. 49 at 9–10.

Clement maintains that Green's actions constituted time theft for several reasons. First,

Green's "core job functions of greeting customers and directing them to available mechanics" required him to be in-person at the dealership. *Id.* at 7; *see* doc. 49-1; *see also* doc. 46 at ¶ 2. Second, the employee handbook instructs employees that failing to accurately clock in and clock out according to company policy could result in termination. Doc. 49 at 7; *see* doc. 49-3 at 5–7; *see also* doc. 46 at ¶ 5. It also admonishes employees that "[f]alsifying time cards is stealing from the company," and that falsifying a time card may result in "immediate dismissal." Doc. 49-3 at 7; *see* doc. 49 at 8. Third, Green "received and acknowledged the Employee Handbook," doc. 49 at 7; *see also* doc. 46 at ¶ 3; doc. 49-2, and "signed the Service Advisor pay plan which states that it is the responsibility of each employee to accurately record time," doc. 49 at 7; *see also* doc. 49-4.

Finally, Clement argues that FMLA leave at Clement is unpaid, and that Green was aware of this fact because it was stated in both the employee handbook and Green's FMLA paperwork. *See* doc. 49 at 8; doc. 49-3 at 6 ("It is the policy of Clement Auto Group to grant up to 12 weeks of unpaid medical and family leave during any 12-month period, to eligible employees, in accordance with the [FMLA]."); doc. 49-5 at 7 (noting that "[s]ome or all of [Green's] FMLA leave [would] not be paid" and indicating that Green did not request to use sick time, vacation time, or other PTO during this period). And because FMLA leave at Clement is unpaid, Clement asserts, Green "was to report any time off taken for FMLA purposes," and his FMLA time as reflected in Paycom "was then to be deducted from his weekly rate (as a salaried employee)." Doc. 49 at 8; *see also* doc. 49-3 at 5 (noting that "Paycom is the basis by which the employee is paid"). Clement therefore concludes that Green "was terminated for blatant and continuous time theft in direct violation of . . . express company policies." Doc. 49 at 7.

11

Green, however, argues that genuine disputes of material fact exist that make summary judgment improper. First, he contests the notion that he did not work on the dates Clement identifies. Doc. 52 at 2. He instead argues that his radiation treatments "generally lasted only a few minutes and that he reported to the dealership and worked after completing those treatments." *Id.*; *see also* doc. 52-1 at ¶¶ 15–17. As a result, "he did not miss full workdays during the period when he was undergoing radiation therapy." Doc. 52 at 2; *see also* doc. 52-1 at ¶ 18.

And the medical records Clement cites do not establish otherwise, Green argues, because these records "identify only the scheduled appointment times and do not establish how long those appointments lasted or whether [Green] returned to work afterward." Doc. 52 at 3. Nor do the lack of service transactions on certain dates establish that Green performed no work, as "service advisors perform numerous duties that do not necessarily generate a customer service transaction, including communicating with technicians, coordinating repairs, speaking with customers about pending work, and handling internal service department matters." *Id.* at 6; *see also* doc. 52-1 at ¶¶ 23–26. And further, Jay Brown's affidavit "does not identify specific dates, times, or durations of any alleged absence and therefore does not establish that [Green] did not perform work on the dates identified by [Clement]." Doc. 52 at 3.

Second, Green asserts that he received no financial benefit from the challenged time entries because he was "paid a fixed weekly salary during the relevant period." *Id.* at 4; *see also* doc. 52-1 at ¶¶ 8, 21–22. Thus, his salary "remained constant regardless of the number of hours recorded in Paycom," so the time entries Clement identifies "could not have resulted in any financial gain to [Green]." Doc. 52 at 4. And this undermines Clement's theory of misconduct,

12

he argues, because "the record contains no evidence that those entries caused [him] to receive compensation he otherwise would not have received." *Id.*

Third, Green contends that, because Christopher Bone "reviewed and approved [his] time entries during the relevant period," and had the ability "to enter or modify employee time entries," management "did not consider [Green's time entries] improper at the time they were made." *Id.* at 5; *see also id.* at 3; doc. 52-1 at ¶¶ 10–12. This, in turn, "creates a factual dispute regarding whether the entries were knowingly false." Doc. 52 at 5.

Finally, Green "testifies that he was terminated without being interviewed or asked to explain the time entries at issue," and that "he was not informed that his time entries were considered fraudulent." *Id.* at 5; *see also* doc. 52-1 at ¶¶ 27–29. He argues that this supports an inference that Clement "did not conduct a meaningful investigation before terminating [him] for alleged misconduct." Doc. 52 at 6.

The Court finds that no genuine dispute of material fact exists on this ground. Even crediting Green's assertion that he "did not miss full workdays" because of his radiation treatments and "performed work on those days after completing [his] medical appointments," doc. 52-1 at ¶¶ 18, 22, Green still admits to violating company timekeeping policy. Indeed, he concedes that, on some of the dates Clement identifies, he "clocked in earlier in the morning before leaving for a medical appointment" so that he would not "forget to clock in later in the day after returning to the dealership." *Id.* at ¶ 20. He does not state that he performed any work-related tasks between the time he clocked in and the time he returned from his medical appointments; he states only that he performed work "*after* completing those treatments." Doc. 52 at 2 (emphasis added); *see also* doc. 52-1 at ¶ 21 ("I reported to the dealership and performed work on those days after completing my medical appointments."). Nor does he dispute

13

Clement's argument that his medical appointments occurred at a location 30 minutes away from the dealership. *See* doc. 49 at 9. *See generally* doc. 52; doc. 52-1.

Green also recognizes that he "received and acknowledged the Employee Handbook," doc. 46 at ¶ 3; *see also* doc. 48 at ¶ 4; doc. 53 at ¶ 4, and that the handbook contained timekeeping policies, the violation of which could result in termination, doc. 46 at ¶¶ 4–5; *see also* doc. 48 at ¶ 8; doc. 53 at ¶ 8. Thus, even when drawing all reasonable inferences in Green's favor, *see AgriStor Leasing*, 826 F.2d at 734, the evidence shows that Green logged at least *some* time for periods when he was not at work, in violation of company policy.

That Green was a salaried employee generally, *see* doc. 52 at 4–5; doc. 52-1 at ¶¶ 3, 8–9, does not move the needle. Green admits that "FMLA leave is generally unpaid." Doc. 53 at ¶ 13; *see also* 29 C.F.R. § 541.602(b)(7) (stating that an employer may pay an employee taking intermittent FMLA leave "a proportionate part of [his] full salary for time actually worked"). And he does not dispute that Clement's policy was to "grant up to 12 weeks of unpaid medical and family leave," doc. 49-3 at 6, or that his FMLA paperwork reflected that "[s]ome or all of [his] FMLA leave [would] not be paid," doc. 49-5 at 7. Nor does he counter Clement's argument that he was required "to report any time off taken for FMLA purposes (e.g., doctor's appointments, treatments, recovery days)." Doc. 49 at 8. *See generally* doc. 52. And as discussed above, Green admits to clocking in early and leaving the clock running while he attended his morning medical appointments. Doc. 52-1 at ¶¶ 19–21.

Thus, contrary to Green's argument, the evidence shows no genuine dispute that Green received at least *some* compensation that he otherwise would not have received. And although Green raises new arguments bearing on this issue in his reply in support of his own motion for summary judgment, *see* doc. 59 at 2, the Court declines to address them. *See Whittington*, 21

14

F.4th at 1002 n.4 (noting that the district court properly disregarded plaintiff's argument "because [he] failed to raise it in either his response in opposition to summary judgment or in his initial brief in support of his cross-motion for summary judgment, waiting until his reply brief to mention it").

Green's argument that his time entries "were visible to management and approved as part of the payroll process," doc. 52 at 5, is a red herring. Green admits that he received and acknowledged the employee handbook, that the handbook contained timekeeping procedures, and that the violation of these procedures could result in termination. Doc. 46 at ¶¶ 3–5. He then admits to violating the timekeeping procedures by improperly logging his time on multiple occasions. *See* doc. 52-1 at ¶¶ 19–20. Green's admissions show that Clement had "a reason unrelated to [his] exercise of FMLA rights for terminating [him]." *Ballato*, 676 F.3d at 772. And Clement produces contemporaneous evidence via affidavits showing that Clement based its termination decision on Green's time theft. *See* doc. 49-8 at ¶¶ 29–33 (affidavit of Christopher Bone); doc. 49-13 at ¶¶ 14–16 (affidavit of Jay Brown). And while Green argues that these affidavits do not "identify specific dates, times, or durations of any alleged absence," doc. 52 at 3, he does not challenge the premise that before his termination, his supervisors noticed that he was absent from work while being clocked in, *see generally id*. Nor can he do so, given his prior admissions. *See* doc. 52-1 at ¶¶ 19–20. Green therefore fails to show a genuine dispute of material fact on this ground. *See Massey-Diez*, 826 F.3d at 1157.

### ii. Changing how Green clocked in

In his Complaint, Green also alleges that Clement interfered with his FMLA rights by "moving [him] to a non-functioning clock in/clock out system so that he could not properly clock in and out of work, in contrast to how other similarly situated employees of [Clement] were then

treated."  Doc. 1 at ¶ 57(c); *see also id.* at ¶¶ 38–39.  But Green does not raise this argument in his response to Clement's motion for summary judgment.  *See generally* doc. 52.  Nor does he provide any evidence supporting this allegation.  *See generally* docs. 51-1, 51-2, 52-1.  "The nonmoving party must cite to specific facts in the record demonstrating a genuine issue of fact for trial and may not rely solely on allegations."  *McElree v. City of Cedar Rapids*, 983 F.3d 1009, 1015 (8th Cir. 2020) (citation omitted).  Green therefore fails to show a genuine issue of fact on this ground.  *See id.*

### iii.    Switching Green's pay status

Green also argues that the record "contains contemporaneous evidence linking [Clement's] employment decisions to [Green's] FMLA status.  Doc. 52 at 7–8.  This is because, in February 2024—during Green's period of intermittent FMLA leave—Clement presented Green with a letter stating that "his compensation would be changed from salary to hourly 'based on [his] FMLA status.'"  *Id.* at 8; *see also* doc. 52-1 at ¶ 30 (noting same); *id.* at 6 (letter from Clement to Green regarding proposed pay status change).  In his declaration, Green states that he "did not sign" the letter, doc. 52-1 at ¶ 32, and "did not agree to this proposed change because [he] understood that it would reduce [his] weekly compensation," *id.* at ¶ 31.  Green argues that a reasonable jury could view Clement's letter "as evidence that [Clement was] seeking to alter [Green's] compensation because of his protected medical leave."  Doc. 52 at 8.  He further posits that this evidence shows that Clement's "stated justification for termination should not be accepted at face value at the summary-judgment stage."  *Id.*

Federal law permits an employer to pay an employee taking intermittent FMLA leave "a proportionate part of [his] full salary for time actually worked."  29 C.F.R. § 541.602(b)(7).  So Clement's seeking to change Green's pay status from salary to hourly does not, standing alone,

16

constitute an FMLA violation.  Rather, the question is whether the amount Clement offered to pay Green ($31 per hour) would constitute a permissible proportionate part of Green's full salary, or whether it would constitute an impermissible reduction in Green's pay, which would make his FMLA leave a "negative factor" in Clement's employment decision.  *See Ballato*, 676 F.3d at 772.

Green maintains that he "typically worked between forty and fifty hours per week" during his time as a service advisor with Clement.  Doc. 52-1 at ¶ 4.  He further avers that he "was compensated on a fixed weekly salary of $1,827, in addition to commissions and bonuses associated with service department performance."  *Id.* at ¶ 3.  Based on his "weekly salary and typical hours worked," Green asserts that his "effective hourly compensation generally exceeded $31 per hour."  *Id.* at ¶ 7.  And he states that his compensation "remained a weekly salary of $1,827 through the date of [his] termination."  *Id.* at ¶ 34.

But the payroll records Green submits do not bear this out.  In reviewing these records, the Court does not consider the commission checks Green received, as Green asserts that his weekly salary of $1,827 was "in addition to commissions and bonuses."  *Id.* at ¶ 3.  The Court also notes that Green does not specify whether the $1,827 per week constituted his gross or net salary, so the Court considers both.  For each regular two-week pay period, Green received gross pay of $3,000, which amounts to $1,500 per week.  *See* doc. 52-1 at 8–15.  His net pay was therefore less than $1,500 per week.  *See id.*  Thus, Green's evidence does not support his assertions regarding his weekly salary, so the Court need not accept these self-serving assertions as true.  *See Smith v. Golden China of Red Wing, Inc.*, 987 F.3d 1205, 1209 (8th Cir. 2021) ("It is black letter summary judgment law that a conclusory, self-serving affidavit will not defeat an otherwise meritorious summary judgment motion." (citation modified)); *Viewpoint Neutrality*

17

*Now! v. Bd. of Regents*, 109 F.4th 1033, 1038 (8th Cir. 2024) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." (citation omitted)).

But even if the Court credited Green's assertion that his salary was $1,827 per week, doc. 52-1 at ¶ 3, or that his "effective hourly compensation generally exceeded $31 per hour," *id.* at ¶ 7, Green does not show that Clement actually reduced his pay. He concedes in his declaration that his compensation "remained a weekly salary of $1,827 through the date of [his] termination." *Id.* at ¶ 34. And while his payroll records show that he was treated as an hourly employee during his last full pay period with Clement (February 25 to March 9, 2024), *see id.* at 8, Green still received the same gross pay of $3,000, *see id.* Lastly, while Green states that his final paycheck following his termination (for the period of March 11–15, 2024) was calculated on an hourly basis, doc. 52-1 at ¶ 37, he does not argue that he received less pay during this period, *see* doc. 52 at 7–8. Green therefore fails to show "a real, remediable impairment of [his] rights under the FMLA" on this ground. *Massey-Diez*, 826 F.3d at 1158. Because Green fails to show that a genuine dispute of material fact exists on his FMLA interference claim, the Court grants summary judgment to Clement on this ground. Doc. 47 at 2.

### b.     Retaliation

Retaliation claims "are about discrimination"—that is, "situations in which an employer treats an employee differently because of a request for a statutory benefit." *Huber v. Westar Foods, Inc.*, 139 F.4th 615, 622 (8th Cir. 2025). Unlike interference claims, retaliation claims focus on whether the employer acted with "retaliatory intent." *Id.* (citation omitted). An employee may establish an employer's retaliatory intent either directly or indirectly. *Id.* Directly establishing such intent "is rare, because it requires a 'specific link' to 'the challenged

18

decision.'" *Id.* (quoting *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 924 (8th Cir. 2014)).  And the evidence "must be strong and clearly point to an illegal motive."  *Id.* (quoting *Ebersole*, 758 F.3d at 924).

But where, as here, an employee lacks direct evidence, he must establish retaliatory intent "circumstantially, through the three-part *McDonnell-Douglas* burden-shifting framework."  *Id.* at 623 (first citing *Ebersole*, 758 F.3d at 924; and then citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Under this framework, "the employee has the initial burden to establish a prima facie FMLA retaliation claim."  *Siebrecht v. Mercy Health Servs. – Iowa Corp.*, 163 F.4th 524, 534 (8th Cir. 2026).  That is, the employee must present sufficient facts for a jury to find that (1) he engaged in protected activity under the FMLA; (2) he suffered an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action.  *Id.*  If the employee makes this showing, "the burden shifts to the employer to present evidence of a legitimate, nondiscriminatory reason for the adverse action."  *Id.*  Lastly, if the employer satisfies its burden, "the employee must present evidence that creates an issue of fact as to whether the employer's reason was pretext for discrimination."  *Id.*

### i.      Prima facie case

In his Complaint, Green asserts many of the same bases for his FMLA retaliation claim as he does for his FMLA interference claim.  *Compare* doc. 1 at ¶ 61, *with id.* at ¶ 57.  The Court finds that these bases (except for those regarding retaliatory termination and denial of COBRA coverage) fail for the reasons discussed above.  *See supra* Section II.A.1.a.  The Court addresses Green's COBRA claim below and turns now to addressing his retaliatory-termination claim.

The parties make much the same arguments regarding the reason for Green's termination as they did for Green's FMLA interference claim.  *See generally* docs. 49, 52.  The Court

19

declines to rehash those arguments and incorporates its reasoning from above. *See supra* Section II.A.1.a.

Clement argues that Green cannot show a causal connection between his taking FMLA leave and his termination. Doc. 49 at 12. Green disagrees, arguing that his termination "occurred during the same period in which he was actively undergoing FMLA-protected cancer treatment." Doc. 52 at 8. This, he asserts, creates "a temporal proximity that itself permits a reasonable inference of a causal connection between [his] protected activity and the adverse employment action." *Id.*

Green is correct that "[t]emporal proximity between a protected activity and a decision to fire, demote, or take other adverse action against an employee *can* support an inference of causation." *Huber*, 139 F.4th at 623 (emphasis in original). But importantly, this temporal proximity must be "very close." *Lissick v. Andersen Corp.*, 996 F.3d 876, 886 (8th Cir. 2021) (citation modified). And to determine temporal proximity, the Court "looks to the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date [that leave] ended." *Id.* at 886–87 (citation omitted). As discussed above, Clement became aware of Green's planned use of FMLA leave on December 5, 2023—the date Chris Bone sent him FMLA paperwork to complete. *See* doc. 49 at 4–5; doc. 49-5 at 1, 6. Clement did not terminate Green until March 15, 2024, doc. 46 at ¶ 18—over three months after learning of Green's need for FMLA leave. Such a lag is too long to establish temporal proximity between Green's FMLA leave and his termination. *See Ebersole*, 758 F.3d at 925 (noting that "a one-month or two-month lag is too long" to establish temporal proximity "absent other evidence"); *Sisk v. Picture People, Inc.*, 669 F.3d 896, 901 (8th Cir. 2012) (finding that "[m]ore than two months is too long to support a finding of causation without something more"). Thus, Green's argument fails.

20

### ii.      Pretext

Even if Green could show a causal connection, however, he nonetheless fails to establish that Clement's reason for his termination was merely "pretext for discrimination." *Siebrecht*, 163 F.4th at 534.  An employee may demonstrate pretext in two ways:  (1) by showing "that the employer's proffered explanation is unworthy of credence" because it "has no basis in fact," or (2) "by persuading the court that an employer's action was more likely motivated by a prohibited reason." *Id.* at 535.  The employee may submit evidence that, among other things, shows that "similarly situated employees who did not engage in the protected activity were treated more leniently," or that "the employer deviated from its policies." *Brandt*, 37 F.4th at 480 (citation omitted); *see also Siebrecht*, 163 F.4th at 536.

Green argues that Clement offered a pretextual reason for his termination.  *See* doc. 52 at 5–6, 8–9.  Specifically, he asserts in his declaration that Clement did not interview him, ask him to explain his time entries, or show him documentation accusing him of time theft before it terminated him.  Doc. 52-1 at ¶¶ 27–29.  He therefore maintains that a reasonable jury could conclude that Clement "did not conduct a meaningful investigation before terminating [him] for alleged misconduct." Doc. 52 at 6.  But Green does not show that Clement's explanation "has no basis in fact," *Siebrecht*, 163 F.4th at 535, as he admitted to violating company policy by clocking in early before driving to his medical appointments, *see* doc. 52-1 at ¶¶ 19–20.  He also does not show that Clement treated "similarly situated employees who did not engage in the protected activity" more leniently.  *Brandt*, 37 F.4th at 480 (citation omitted).  Indeed, he fails to rebut that Clement has fired employees for time theft in the past, and that it did so without issuing a warning to either employee before termination.  *See* doc. 49 at 11–12; docs. 49-11, 49-12.  *See generally* doc. 52.  Finally, he produces no evidence showing that Clement had a policy

21

of interviewing or speaking with employees accused of time theft before termination.  *See generally* docs. 51-1, 51-2, 52-1.  He therefore fails to persuade the Court that Clement's action "was more likely motivated by a prohibited reason."  *Siebrecht*, 163 F.4th at 535.  Because Green has failed to show a prima facie case of retaliation or that Clement's reason for terminating him was pretextual, the Court grants Clement's motion for summary judgment on Green's FMLA retaliation claim.  Doc. 47 at 3.

### 2.     COBRA claim

COBRA provides that employees, former employees, and their dependents may elect to continue receiving the employer's health care coverage upon the occurrence of a qualifying event.  *See* 29 U.S.C. § 1161(a).  The statute "requires the administrators of covered group health plans to notify terminated employees that they have the option of continuing their benefits after their employment ends."  *Hearst v. Progressive Foam Techs., Inc.*, 641 F.3d 276, 280–81 (8th Cir. 2011) (citation omitted); *see also* 29 U.S.C. §§ 1163(2), 1166(a)(4)(A).  The administrator must notify the terminated employee of this option within 44 days of termination.  *See* 29 U.S.C. §§ 1166(a)(2), (c).  An administrator who fails to do so "may[,] in the court's discretion[,] be personally liable to [the terminated employee] in the amount of up to $100 a day from the date of such failure or refusal."  29 U.S.C. § 1132(c)(1).  But COBRA relieves an employer of its obligation to notify and provide continued health care coverage if an employee is terminated for "gross misconduct."  *See* 29 U.S.C. § 1163(2).

Neither COBRA nor its implementing regulations provide a definition of gross misconduct.  The Eighth Circuit has described gross misconduct as a "rather nebulous term."  *Johnson v. U.S. Bancorp Broad-Based Change in Control Severance Pay Program*, 424 F.3d 734, 739 (8th Cir. 2005).  And it has addressed the term only in the context of whether an

22

employee's conduct constituted gross misconduct as that term was defined in her employer's severance plan. *Id.* at 739–40.  The Eighth Circuit "has not further defined gross misconduct," and "a dearth of authority" exists defining gross misconduct in the COBRA context generally. *Higareda v. Tyson Foods, Inc.*, No. 3:19-cv-00075-RGE-SBJ, 2020 WL 6930453, at *3 (S.D. Iowa Oct. 6, 2020).

Despite this lack of authority, however, several federal courts agree that gross misconduct encompasses more than mere negligence, incompetence, or occasional lapses in judgment.  *See, e.g.*, *Mlsna v. Unitel Commc'ns, Inc.*, 91 F.3d 876, 880–81 (7th Cir. 1996); *Paris v. F. Korbel & Bros., Inc.*, 751 F. Supp. 834, 838–39 (N.D. Cal. 1990); *Lloynd v. Hanover Foods Corp.*, 72 F. Supp. 2d 469, 478–79 (D. Del. 1999); *Nero v. Univ. Hosps. Mgmt. Servs. Org.*, No. 1:04CV1833, 2006 WL 2933957, at *4 (N.D. Ohio Oct. 12, 2006); *Nakisa v. Cont'l Airlines*, No. CIV. A. H–00–090, 2001 WL 1250267, at *2 (S.D. Tex. May 10, 2001).  For example, courts have declined to find gross misconduct where an employee was inadequate in his job as controller for a company, *see Mlsna*, 91 F.3d at 880–82; where an employee relayed the substance of a private conversation to a coworker's wife, *see Korbel*, 751 F. Supp. at 837–39; where an ingredients mixer at a food preparation plant forgot to add an ingredient to a food mixer on one occasion, *see Lloynd*, 72 F. Supp. 2d at 478–79; and where a medical assistant filed lab results in the wrong chart, mislabeled a blood sample, and failed to follow through with patient referrals on occasion, *see Nero*, 2006 WL 2933957, at *5.

Some federal courts have defined gross misconduct as conduct that is "intentional, wanton, willful, deliberate, reckless[,] or in deliberate indifference to an employer's interest." *Collins v. Aggreko, Inc.*, 884 F. Supp. 450, 454 (D. Utah 1995).  Others have described it as conduct that is "outrageous, extreme[,] or unconscionable"—that is, conduct which "shocks the

23

conscience." *Zickafoose v. UB Servs., Inc.*, 23 F. Supp. 2d 652, 655 (S.D. W. Va. 1998).  And the Seventh Circuit has held that, for an employer to avoid its COBRA obligations, it must have more than an "honest, actual belief" that an employee engaged in gross misconduct; the facts must instead show that the employee "indeed engage[d] in gross misconduct." *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 680 (7th Cir. 1997).

The Court finds the above definitions consistent with the plain meaning of "gross misconduct" around the time of COBRA's enactment in 1985.  *See Gross*, *Black's Law Dictionary* (5th ed. 1979) (defining "gross" as "[o]ut of all measure; beyond allowance; flagrant; shameful"); *Misconduct*, *Black's Law Dictionary* (5th ed. 1979) (defining workplace misconduct as that which "evinces [a] willful or wanton disregard of [the] employer's interest, as in deliberate violations, or disregard of standards of behavior which employer has right to expect of his employees, or in carelessness or negligence of such degree or recurrence as to manifest wrongful intent or evil design").

As relevant here, federal courts have found gross misconduct when an employee stole from her employer, *see Burke v. Am. Stores Emp. Benefit Plan*, 818 F. Supp. 1131, 1135–38 (N.D. Ill. 1993), and when a security guard deserted his post and falsified a work log to receive a second, unearned paycheck, *see Adkins v. United Int'l Investigative Servs., Inc.*, No. C 91–0087 BAC, 1992 WL 12942441, at *4 (N.D. Cal. Mar. 27, 1992).  Federal courts have also indicated that an employee's misappropriating company funds may constitute gross misconduct.  *See Conery v. Bath Assocs.*, 803 F. Supp. 1388, 1396 (N.D. Ind. 1992).

Here, Green alleges that Clement "failed to provide [him] with timely and proper notice of COBRA continuation coverage rights," doc. 1 at ¶ 67, causing him to incur out-of-pocket medical expenses and other costs, *id.* at ¶ 68.  Clement responds that Green was not entitled to

24

continued COBRA coverage because Clement terminated his employment for time theft—which, it argues, constitutes gross misconduct. Doc. 49 at 13. Green again states that his sworn declaration shows that "his radiation treatments were brief, that he worked after completing those treatments, and that his supervisor approved the time entries in question." Doc. 52 at 9; *see also* doc. 52-1 at ¶¶ 10–11, 15–18. Therefore, he argues, "the record presents a genuine dispute regarding whether [he] engaged in any misconduct at all." Doc. 52 at 9.

But even when drawing all these inferences in Green's favor, his argument fails. As the Court already found, the evidence shows that Green engaged in at least *some* time theft during his employment with Clement. Such theft illustrates an intentional, willful, deliberate, or reckless indifference to his employer's interest. *See Burke*, 818 F. Supp. at 1135–38; *Adkins*, 1992 WL 1292441, at *4. The Court thus finds that Green engaged in gross misconduct. Clement therefore had no obligation to notify Green of his right to continued COBRA coverage. The Court grants Clement's motion for summary judgment on Green's COBRA claim. Doc. 47 at 4–5.

### 3.      Clement's remaining requests

Clement separately requests that the Court strike Green's additional statement of facts and declaration in their entirety "for violation of the sham affidavit rule." Doc. 58 at 3. It argues that (1) Green's statements in his "verified Complaint" and declaration conflict regarding whether he took off full workdays for his radiation treatments; (2) Green's statements in his declaration about his weekly compensation being $1,827 are unsupported; and (3) Green's statement of facts contains vague, ambiguous, or conclusory statements that "cannot be substantiated." *Id.* at 3–4. But because the Court grants summary judgment in Clement's favor

notwithstanding the perceived defects in Green's declaration and statement of facts, the Court denies Clement's request as moot. *Id.*

### B.    Green's motion for partial summary judgment

Based on the same facts underlying Green's Complaint, Clement filed a counterclaim against Green for breach of contract, unjust enrichment, and common-law fraud. *See* doc. 44. Green moves for summary judgment on Clement's fraud claim. *See* doc. 50. But, having disposed of Green's federal claims, and finding no basis for diversity jurisdiction, *see* docs. 1, 44, the Court declines to exercise supplemental jurisdiction over Clement's state-law claims. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S 715, 726 (1966) (stating that when a federal court dismisses all federal claims before trial, it should also dismiss the state claims); *see also Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 977 (8th Cir. 1993).

When a court dismisses all federal claims on a motion for summary judgment, "the balance of factors to be considered under the supplemental jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will [usually] point toward declining to exercise jurisdiction over the remaining state-law claims." *Leask v. City of Minneapolis*, 172 F.4th 598, 601 (8th Cir. 2026). This is true even when a defendant has filed a counterclaim. *See Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs.*, 141 F.3d 1284, 1286–88 (8th Cir. 1998); *Willman v. Heartland Hosp. East*, 34 F.3d 605, 613–14 (8th Cir. 1994). The Court therefore dismisses Clement's counterclaim without prejudice. Doc. 44. The Court also denies as moot Green's motion for partial summary judgment. Doc. 50.

## IV.     Conclusion

Accordingly, the Court grants Clement's [47] Motion for Summary Judgment, dismisses Clement's [44] Counterclaim without prejudice, and denies as moot Green's [50] Motion for Partial Summary Judgment.  A separate judgment accompanies this Memorandum and Order.

So ordered this 18th day of June 2026.

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE